IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 26, 2005

## STATE OF TENNESSEE v. RODNEY J. CAMPBELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-D-2636     J. Randall Wyatt, Jr., Judge**

_____

**No. M2004-02088-CCA-R3-CD - Filed September 7, 2005**

_____

The defendant, Rodney J. Campbell, was indicted for premeditated first degree murder, felony murder, and especially aggravated kidnapping. He was convicted by jury of kidnapping and two counts of second degree murder. As a result of these convictions, he was sentenced to a total effective sentence of thirty-one years in the Department of Correction. On appeal, the defendant raises four issues for our review: (1) whether the trial court erred in denying his motion for judgment of acquittal; (2) whether the evidence is insufficient to support his convictions; (3) whether the trial court properly instructed the jury; and (4) whether the trial court erred in imposing an excessive sentence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Paul Julius Walwyn, Madison, Tennessee, for the appellant, Rodney J. Campbell.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Jim Todd, Harold Donnelly, and Brett Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

The following proof was presented at trial. On June 3, 2002, Cornelius Primm (C.P.) and the defendant were picked up by Jerry Primm (J.P.). The three men drove to a "car shop" located on Straightway and met with Brandon Lake. J.P. had been robbed and was looking for the victim, Gary Moment, whom he believed was involved or had information about the robbery. When the men reached the "car shop," J.P. asked Lake if he knew where to find the victim. Lake got into the car, and the four of them drove to Creighton Avenue looking for the victim. The men spotted the

victim on Creighton Avenue walking with his bicycle and talking to Antwain Broome; whereupon, J.P. pulled the car up to the victim and asked him to get into the car. The victim initially refused, but after J.P. insisted, he gave his bicycle to Broome, and traded places with Lake. J.P. then drove away.

After driving around the neighborhood, J.P. stopped the car and told C.P. to drive. J.P. got into the backseat with the victim, and the defendant moved to the front passenger seat. As the defendant moved to the front seat, he took a .380 semi-automatic handgun from his pants and placed it in his lap. As C.P. drove back down Creighton Avenue, J.P. began arguing with the victim. At some point, J.P. told C.P. to stop the car in front of a house. J.P. asked the victim if this was the house and the victim told him yes. J.P. then struck the victim on the forehead with a .357 magnum revolver, and the victim's head began to bleed. J.P. got out of the car and told the defendant and C.P. to shoot or kill the victim if he attempted to get out of the car. J.P. then walked to the house. After four or five minutes, the defendant told the victim to roll up the window because the air conditioner was on. Moments later, the victim suddenly reached for the .380 handgun resting on the defendant's lap and the car door. Although the victim did not get control of the handgun, he opened the car door and started to run. As the victim was exiting the car, the defendant fired four or five shots at him. J.P. also fired six shots at the victim as he ran away. The three men then drove to J.P.'s sister's house, stayed for a couple of hours, and left in different vehicles.

Around 2:45 p.m. on June 3, 2002, Police Officer Kevin Allen responded to a call concerning shots fired on Creighton Avenue. After knocking on a few doors, Officer Allen spoke with an individual who stated that he heard shots and saw one person run away. However, Officer Allen did not locate any blood or shell casings in the area. Lisa Moment, the victim's sister became concerned for her brother after he failed to come home on June 3, 2002. A few days later, Ms. Moment contacted Broome, who told her that he saw the victim get into a car on Creighton Avenue. Ms. Moment drove to the area and began to search for her brother. After walking behind some houses near some railroad tracks, Ms. Moment discovered the victim's body and called the police.

Police officers from the Crime Scene Identification Unit responded to Ms. Moment's call and reached the crime scene. Upon arrival, the officers observed that the victim's body was badly decomposed, lying face up in the grass near some railroad tracks. A cigarette lighter was found near the victim's body and a shell casing was discovered on some pavement near the crime scene area.

Detective Jim Fuqua began to investigate the victim's death. He interviewed Lake, who gave a taped statement indicating that he saw the victim get into a car. Lake identified the defendant from a photographic lineup as one of the individuals in the car. Detective Fuqua also spoke with Broome, who described the car the victim got into as a white Buick. The Buick was later impounded and processed for evidence. The police officer processing the Buick found a black gun holster and a black stocking cap in the front seat, and three splotches of blood in the back seat area. The blood samples retrieved from the white Buick were tested by the Tennessee Bureau of Investigation. After the blood samples were tested, it was determined that the blood was not from J.P., C.P., or the defendant. Although the quality of victim's blood sample was insufficient to allow for proper DNA

analysis, the blood samples were compared with a blood sample from the victim's mother and were found to be consistent with her male offspring.

As the investigation proceeded, J.P., C.P., and the defendant were arrested. After J.P. was interviewed, the defendant gave a taped statement to the police. In the defendant's taped statement, he told police that J.P. called him and told him that he had been robbed by two men and thought he had found them. According to the defendant, he and C.P. were picked up by J.P., and they went looking for the men who robbed J.P. However, the defendant stated that he did not know what was taken from J.P.

The defendant told police that after J.P. gave the instructions to shoot the victim, he was nervous and thought the victim was "fixing to try something." The defendant admitted that he shot at the victim as the victim was exiting the car. As the defendant explained, when the victim reached for the .380, the gun went off two or three times. The defendant admitted, however, that he shot at the victim when the victim jumped out of the car. The defendant stated that he did not think that he hit the victim. The defendant also stated that he saw J.P. shoot at the victim. The defendant told the police that he had a .380 caliber handgun and J.P. had a .357 magnum revolver. The defendant then told the police where to find his gun. The defendant was shocked when he learned that the victim was dead.

An autopsy of the victim revealed that the victim's body was in an advanced state of decomposition, which was consistent with the time lapse between the victim's last appearance alive and when the victim's body was discovered. The autopsy also revealed that the victim died from multiple gunshot wounds to his torso and leg. Two bullets were recovered from the victim's body. It was determined from ballistic testing and examination of the defendant's .380 caliber pistol that the two bullets recovered from the victim's body were fired from the defendant's firearm "to the exclusion of all other firearms." The shell casing recovered from the area close to the crime scene was also determined to have been fired from the defendant's gun.

Based upon the evidence presented, the jury found the defendant guilty of two counts of second degree murder, Class A felonies, and one count of kidnapping, a Class C felony. The trial court merged the second degree murder convictions, then imposed a twenty-five-year sentence for the defendant's second degree murder conviction and a six-year sentence for the defendant's kidnapping conviction. The trial court ordered the defendant's sentences to be served consecutively for a total effective sentence of thirty-one years in the Department of Correction.

## II. Analysis

### A. Judgment of Acquittal

On appeal, the defendant claims that the trial court erred by denying his motion for judgment of acquittal as to his kidnapping conviction. Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same

standard which applies on appeal in determining the sufficiency of the evidence after a conviction," State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000), this claim will be included with the defendant's challenge to the sufficiency of the convicting evidence.

## B. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. Id.

In order to sustain the defendant's conviction for kidnapping, the State had to prove beyond a reasonable doubt that the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with his liberty and that the victim was exposed to a substantial risk of bodily injury. Tenn. Code Ann. §§ 39-13-302, -303. To sustain the defendant's conviction for second degree murder, the State was required to prove that the defendant knowingly killed the victim. Tenn. Code Ann. § 39-13-210(a)(1).

In the instant case, the proof at trial demonstrated that J.P., C.P., and the defendant drove around looking for the victim because J.P. thought the victim either took part in robbing him or knew who robbed him. When the victim was discovered walking on Creighton Avenue, J.P. pulled up to him and asked him to get into the car. With some hesitation, the victim got into the car. After the victim got into the car with the three men, he and J.P began arguing. J.P. then hit the victim on the forehead with a gun. After the men drove to a house on Creighton Avenue, J.P. got out of the car and told the defendant and C.P. to shoot or kill the victim if he tried to escape. At some point, the defendant directed the victim to roll the car window up. After a few minutes, the victim, knowing the defendant had a gun, attempted to grab the gun, then fled. In response, the defendant fired off a couple of shots. As the victim was exiting the vehicle and running away, the defendant shot at the victim four or five more times. The victim's body was discovered behind a house on Creighton

Avenue. An autopsy revealed that the victim died from multiple gunshot wounds. Two bullets recovered from the victim's body were determined to have been fired from the defendant's gun. Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find beyond a reasonable doubt that the defendant committed the offenses of kidnapping and second degree murder. Accordingly, the defendant is not entitled to relief on this issue.

## C. Jury Instruction

The defendant contends that the trial court erred in failing to charge the jury that he could be found not guilty of the charges brought against him. Initially, we note that the defendant has failed to cite any authority for his contention and fails to cite to the record. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that an appellate brief shall contain "[an] argument . . . setting forth the contentions of the [defendant] with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." However, in the interest of judicial fairness and efficiency, we will review the defendant's contention on the merits.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. Id. In evaluating claims of error in the jury charge, this Court must review the charge in its entirety and read it as a whole. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). A charge shall be considered prejudicially erroneous if it fails to submit the legal issues fairly or if it misleads the jury as to the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Upon review, we conclude that the jury charge in this case fairly defined the issues of law and did not mislead the jury. The trial court read the jury charge in its entirety. In relevant part, the trial court instructed the jury as follows:

> The law presumes that the defendant is innocent of the charges against him. This presumption remains with the defendant throughout every stage of the trial and it is not overcome unless from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> . . . .
>
> The crime charged in each count of the indictment is a separate and distinct offense. You must decide each count separately on the evidence and law applicable to it. The defendant may be convicted or acquitted on any or all of the offenses

-5-

charged, but in no event to more than one offense as to each respective count. Your findings as to each count must be stated in your verdict.

If after a consideration of all the facts in this case, you have a reasonable doubt of the guilt of the defendant of any of the offenses heretofore defined and explained to you, it would be your duty to give the defendant the benefit of such doubt and your verdict would be simply not guilty.

The defendant has not demonstrated how the trial court's instruction was incorrect or improper. Therefore, this issue is without merit.

## D. Sentencing

In challenging his sentences, the defendant argues that the trial court erred in enhancing his sentences and ordering them to be served consecutively.

Before a trial court sentences a convicted defendant, it must consider (1) the evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. Imfeld, 70 S.W.3d at 704-05.

Appellate review of a challenged sentence is a *de novo* review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

According to Tennessee sentencing statutes, the sentencing range for a Range I offender who commits a Class A felony is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The range for a Class C felony is three to six years. Id. § 40-35-112(a)(3). In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint of the range if there are

no enhancement or mitigating factors. Id. § 40-35-210(c). In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the statutory minimum if there are no enhancement or mitigating factors. Id. If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum but still within the range. Id. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Id. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

After hearing the witnesses' testimony and considering the presentence report, the trial court applied enhancement factors (21), the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult; and (14), the defendant committed the instant felony while on juvenile probation. Id. § 40-35-114(21), (14). Based upon the existence of these factors, the trial court sentenced the defendant to twenty-five years for his second degree murder conviction and six years for his kidnapping conviction. The trial court found the defendant had committed these offenses while on probation and ordered the defendant's sentences to be served consecutively. Id. § 40-35-115(a)(6).

With one single reference to "Blakely v. Washington" without citation, the defendant argues that his sentences are excessive. However, the defendant does not expound upon his argument, and again, the defendant fails to cite relevant authority or reference the record in support of his argument. Therefore, we determine this argument to be without merit for both procedural and substantive reasons. Procedurally, issues which are not supported by argument, citation to authorities, or appropriate references to the record are treated as waived by this Court. Tenn. Ct. Crim. App. Rule 10(b). Substantively, the defendant presents no facts or legal authority to demonstrate how the trial court erred, and the record supports the defendant's sentences. Consequently, we conclude that the defendant's sentences are proper and he is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE